**BIGG WOLF DISCOUNT VIDEO MOVIE SALES, INC.**

v.

**MONTGOMERY COUNTY, Maryland**

**No. CIV.A. DKC 2001–3386.**

United States District Court,
D. Maryland.

March 28, 2003.

Paul J Cambria, Jr., Barry Nelson Covert, Lipsitz Green Fahringer Roll Salisbury and Cambria LLP, Buffalo, NY, Jo-

seph B Chazen, Gina Marie Smith, Meyers Rodbell and Rosenbaum PA, Riverdale, MD, for Mid–Atlantic Management Corp.

Jonathan Lawrence Katz, Marks and Katz LLC, Silver Spring, MD, for Bigg Wolf Discount Video Movie Sales, Inc.

Clifford L. Royalty, Office of the County Attorney for Montgomery County MD, Rockville, MD, for Montgomery County, Maryland.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this case raising a constitutional challenge to a Montgomery County zoning ordinance restricting "adult entertainment businesses" are the following motions: (1) the motion of Plaintiff Bigg Wolf Discount Video Movie Sales, Inc. ("Plaintiff" or "Bigg Wolf") to join and consolidate with the case of Mid–Atlantic Management Corporation ("Mid–Atlantic"); (2) the motion of Bigg Wolf to strike material provided by Defendant Montgomery County ("Defendant" or "the County") after the discovery deadline had passed; and (3) the motion of Defendant for summary judgment and its counterclaim for injunctive relief. The issues have been fully briefed and no hearing is deemed necessary. Local Rule 105.6. For reasons that follow, Plaintiff's motions to consolidate and strike will be denied. Defendant's motion for summary judgment will be granted in part, but its counterclaim for injunctive relief will be dismissed without prejudice.

## I. Background

Unless otherwise noted, the following facts are undisputed. Plaintiff Bigg Wolf is the owner and operator of a retail store at 9421 Georgia Avenue, Silver Spring, Maryland. The store's primary merchandise is comprised of prerecorded videocas-settes and DVDs for purchase and rental. A majority of these are sexually explicit. The store also sells sexually-oriented merchandise such as condoms, sex toys and sexual lubricants. Paper no. 5, Ex. 1.

Bigg Wolf limits the availability of sexually explicit merchandise in its store to consenting adults aged 21 or older. Such merchandise is confined to a separate rear area of the store that is set apart from the rest of the store and which is not visible from the rest of the store or the street. Paper no. 1, at ¶¶ 17, 18. The rear area comprises over 50% of the store's space that is open to customers, though Plaintiff's owner states that sexually explicit merchandise comprises approximately 85–90% of the store's sales. Testimony of Richard Biggs, Preliminary Injunction Hearing, January 29, 2002; Paper no. 5, Ex. 1, at ¶ 6. There are no booths for viewing tapes or DVDs at the store. Paper no. 1, at ¶ 17; Paper no. 5, Ex. 1.

On April 11, 2000, the Montgomery County Council enacted Ordinance No. 14–19 ("the Ordinance"), which amended certain zoning provisions directed towards "adult entertainment businesses." Montg. County Zoning Code §§ 59–A–2.1, 59–A–6.16. Prior to the enactment of these amendments, Bigg Wolf had been lawfully located at its present address since 1998. The amendments contained in Ordinance No. 14–19 became effective on May 1, 2000. Paper no. 31, Ex. 1. Under the amended zoning provisions, all "adult entertainment businesses" in Montgomery County must be located in the county's C–2, I–1 or I–2 zoning districts. Montg. County Zoning Code §§ 59–C–4.2(d), 59–C–5.21(d). The zoning provisions, § 59–A–2.1, define "adult entertainment business" as follows:

An establishment that: (1) sells, rents, exhibits, or displays adult entertainment materials using a floor area that is more

than 10 percent of the total floor area for selling, renting, exhibiting, or displaying all materials; (2) features nude persons or adult entertainment performances; or (3) otherwise requires a County license as an adult entertainment business.

The same section defines "adult entertainment material" as:

Material that is a book, magazine, periodical, or other printed matter; photograph, film, motion picture, video cassette, slide or other visual representation; sculpture or 3–dimensional representation; or sexual paraphernalia that depicts or describes, or a live performance that depicts, sadomasochistic abuse, sexual conduct, or sexual excitement as defined in State law (Section 416A of Article 27 of the Annotated Code of Maryland).

The referenced provisions of MD. CODE ANN. art. 27, § 416A[1] define the foregoing terms as follows, in pertinent part:

(c) "Sadomasochistic abuse" means flagellation or torture by or upon a human who is nude or clad in undergarments, or in a revealing or bizarre costume, or the condition of one who is nude or so clothed as being fettered, bound, or otherwise physically restrained;

(d) "Sexual conduct" means human masturbation, sexual intercourse, or any touching of or contact with genitals, pubic areas, or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex, or between human and animals;

(e) "Sexual excitement" means the condition of human male or female genitals, or the breasts of the female when in a state of sexual stimulation, or the sensual experience of humans engaging in or witnessing sexual conduct or nudity.

In addition to confining them to the aforementioned zoning districts, the zoning provisions, § 59–A–6.16, place the following restrictions on the location and practices of adult entertainment businesses, in pertinent part:

(a) An adult entertainment business is permitted in certain zones, subject to the following restrictions and regulations:

(1) The adult entertainment materials must not be visible from outside the establishment. . .

(3) The adult entertainment business must be located at least 750 feet from any property: (A) located in a residential zone, or (B) on which a school, library, park, playground, recreational facility, day care center, place of worship, or other adult business is located as a principal use. The distance must be measured in a straight line from the nearest property line of the property used for the adult entertainment business to the nearest boundary line of any property located in a residential zone, or on which a school, library, park, playground, recreational facility, day care center, place of worship or other adult entertainment business is located. . .

(5) An adult entertainment business may operate only between the hours of 9:00 a.m. and 11:00 p.m.

The zoning provisions allowed existing non-conforming adult entertainment businesses to continue to operate for eighteen months following the effective date of the amendment. At the expiration of this

---

1. Effective October 1, 2002, MD. CODE ANN. art. 27, § 416A was replaced by MD. CODE ANN., CRIM. LAW § 11–101 without any substantive change. See MD. CODE ANN., CRIM. LAW § 11–101 Revisor's Note.

amortization period, in October 2001, the Code requires compliance with the requirements of the amended zoning ordinance. Paper no. 31, Ex. 1, 2.

Plaintiff filed a six-count complaint on November 14, 2001, challenging the constitutionality of the zoning provisions regulating adult entertainment businesses. Specifically, Plaintiff seeks a declaration that the relevant portions of the zoning ordinance violate the United States Constitution and the Maryland Declaration of Rights and an injunction prohibiting the County from enforcing the zoning provisions against Plaintiff or any other adult entertainment business located in Montgomery County. Plaintiff also seeks unspecified money damages under 42 U.S.C. § 1983. In response to the complaint, Defendant filed an answer and counterclaim seeking to enjoin Plaintiff from continuing to violate the zoning ordinance.

Before the County filed its answer, Plaintiff moved for a preliminary injunction pending the outcome of this case, and the County then filed an opposition and motion to dismiss. Plaintiff's motion was based largely on the assertion that the provisions at issue are not a constitutional time, place, and manner ("TPM") restriction on speech protected by the First Amendment. Plaintiff claimed that the County did not satisfy the standard for such zoning restrictions set forth in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), because it did not actually rely on appropriate studies of adverse secondary effects to justify the zoning, narrowly tailor the zoning to combat those secondary effects, and provide reasonable alternative means of communication. Plaintiff also asserted that the Ordinance is unconstitu-

tionally vague and overbroad, constitutes a prior restraint on protected speech, and violates equal protection. The court held an evidentiary hearing on January 28, 2002 and issued a memorandum opinion on February 6, 2002 denying Plaintiff's motion for a preliminary injunction and Defendant's motion to dismiss. Defendant now moves for summary judgment on Plaintiff's challenge to the constitutionality of Ordinance No. 14–19 and also seeks injunctive relief on its counterclaim against Plaintiff.

## II.  Analysis

### A.  Plaintiff's Motion to Join and Consolidate

Plaintiff Bigg Wolf has moved to join together with the plaintiff in *Mid–Atlantic Management Corporation v. Montgomery County*, DKC–01–CV–2822, and to consolidate their civil actions because both seek to declare unconstitutional various adult use provisions of the County's zoning laws.[2] Plaintiff contends that there will be little prejudice from such consolidation and that any such prejudice would be outweighed by judicial economy. The County opposes consolidation, noting that there are already separate scheduling orders in place in the two cases and that there are substantive issues that the two cases do not share in common. Mid–Atlantic filed a response noting the separate scheduling orders and divergent issues, but declining to take a position on Plaintiff's motion for consolidation.

Since Plaintiff filed the motion to consolidate on or about April 10, 2002, there have been delays in the *Mid–Atlantic* case, unlike Plaintiff's case, due in part to efforts to reach a settlement. As such, it would be inappropriate to consolidate the

---

**2.** Although Plaintiff cites FED. R. CIV. P. 20 in its motion, it appears that FED. R. CIV. P. 42, which governs consolidation of actions shar-

ing questions of common law or fact, is more applicable to the relief Plaintiff seeks.

two cases at this time. Accordingly, Plaintiff Bigg Wolf's motion to consolidate its case with the *Mid–Atlantic* case will be denied without prejudice.

### B. Plaintiff's Motion to Strike

Plaintiff Bigg Wolf moves to strike several exhibits attached to Defendant County's motion for summary judgment which it claims were "not provided to Plaintiff" before the discovery deadline. Specifically, Plaintiff seeks to strike Exhibits 12a through 12s, which are photographs of Plaintiff's store, and Exhibits 13 and 18, which are the affidavits of Reginald T. Jetter and Mark Moran, respectively. Plaintiff also moves to strike Exhibit 5 to Defendant's motion for summary judgment, a copy of a study of the secondary effects of adult entertainment establishments in Los Angeles, because it is missing many pages. Plaintiff's motion to strike is entirely without merit.

Defendant has proffered evidence that it offered Plaintiff the opportunity to inspect the photographs of Plaintiff's store, pursuant to Plaintiff's document production request, *prior* to the discovery deadline. *See* Paper no. 35, Ex. 1. Defendant has, therefore, provided evidence that it complied with the appropriate discovery rules with respect to the photographs, and there is no basis for striking the photographs. *See* FED. R. CIV. P. 34.[3] Plaintiff's request to strike the affidavits of Reginald T. Jetter and Mark Moran because they were not provided to Plaintiff during discovery is similarly without merit. In its motion to strike, Plaintiff does not identify the discovery request in which it actually sought the affidavits. Moreover, the affidavits appear to have been prepared in support of

Defendant's motion for summary judgment and are, therefore, not even subject to the discovery deadline. Accordingly, Plaintiff has identified no colorable basis for striking these exhibits. There is also no basis for Plaintiff's motion to strike Defendant's excerpted copy of the Los Angeles study of secondary effects. Plaintiff does not argue that it was denied access to the study during discovery, nor that the study is inaccurate as excerpted. The entire study apparently is even available as part of the legislative record accompanying the Ordinance at issue. Because all of Plaintiff's discovery claims lack merit, the motion to strike will be denied in its entirety.

### C. Defendant's Motion for Summary Judgment

#### 1. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the

---

**3.** Defendant apparently even offered to Plaintiff that it would copy the photographs to floppy disks, *see* Paper no. 35, Ex. 2, and, in fact, did so once Plaintiff's counsel finally provided the disks on July 24, 2002, to which Defendant could copy the photographs. *See id.*, Ex. 3. Defendant returned the disks one week later. *See id.*, Ex. 4.

burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

Defendant contends that it is entitled to summary judgment with respect to all grounds upon which Plaintiff challenges Ordinance No. 14–19. The court will assess each of the avenues Plaintiff uses to attack the Ordinance.

## 2. Invalid Time, Place and Manner Restriction

■ The First Amendment protects non-obscene, sexually explicit speech. *See Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).[4] When a legislative body passes an act that impacts protected speech, it bears the burden, when challenged, of showing either (1) that its action serves a compelling state interest which cannot be served in a less restrictive way,

or (2) that its action is a content-neutral time, place, and manner restriction. *See, e.g., Renton*, 475 U.S. at 46–47, 106 S.Ct. 925; *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 143–44 (4th Cir.1992). The level of scrutiny applied to a regulation is determined by whether that regulation is aimed at the contents of protected speech. "In sum, regulations that affect First Amendment interests and are content-based are evaluated under 'strict scrutiny'; regulations that affect First Amendment interests but are content-neutral are evaluated under 'intermediate scrutiny.'" *N.W. Enterprises, Inc. v. City of Houston*, 27 F.Supp.2d 754, 773 (S.D.Tex.1998) (citing *Renton*, 475 U.S. at 46–47, 106 S.Ct. 925); *see also Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). In order to determine whether a regulation that affects speech is content-based or content neutral, "courts look primarily to the respective government's purpose in enacting the regulation." *University Books and Videos, Inc. v. Metropolitan Dade County*, 33 F.Supp.2d 1364, 1369 (S.D.Fla.1999) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

In *Renton*, the Court upheld a local zoning ordinance that restricted the possible locations for adult businesses, even those engaging in constitutionally protected speech, as a constitutional TPM restriction. Though that ordinance, like the one at issue in this case, differentiated between sexually explicit and other uses, it was deemed content-neutral because the government's purpose in enacting it was to

---

**4.** The corresponding provision of the Maryland Declaration of Rights, Article 40, states that "every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege." Because Article 40 is in *pari materia* with the First Amend-

ment to the United States Constitution, the opinion will focus on First Amendment jurisprudence. *See Pendergast v. State*, 99 Md. App. 141, 636 A.2d 18 (1994). *See also Pack Shack, Inc. v. Howard County*, 138 Md.App. 59, 770 A.2d 1028 (2001).

combat the adverse secondary effects that adult businesses are believed to have on the community. Thus, TPM restrictions that burden speech incidental to a content-neutral goal, similar to the one at issue in this case, have been upheld as valid exercises of municipalities' police power. *Renton*, 475 U.S. at 49–50, 106 S.Ct. 925; *see also City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Allno Enterprises, Inc. v. Baltimore County, Maryland*, 2001 WL 589423 (4th Cir.2001) (unpublished disposition); *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140 (4th Cir.1991); *David Vincent, Inc. v. Broward County, Florida*, 200 F.3d 1325 (11th Cir.2000). *D.H.L Associates, Inc. v. O'Gorman*, 199 F.3d 50 (1st Cir.1999); *Phillips v. Borough of Keyport*, 107 F.3d 164 (3rd Cir.1997); *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413 (8th Cir.1994).

■ *Renton* sets forth the standard for determining whether such content-neutral zoning ordinances are constitutional:

> [R]egulations enacted for the purpose of restraining speech on the basis of its content presumptively violate the First Amendment. On the other hand, the so-called "content neutral" time, place, and manner regulations are acceptable as long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.

*Renton*, 475 U.S. at 46–47, 106 S.Ct. 925. In addition to the two explicit *Renton* requirements regarding substantial governmental interest and reasonable alternative channels, a content-neutral zoning ordinance that imposes distance and space requirements on adult businesses must be narrowly tailored to achieve the government interest. *See Ward*, 491 U.S. at 795–802, 109 S.Ct. 2746. Municipalities cannot justify zoning ordinances that incidentally impact speech merely by pointing to their content-neutrality. Rather, they must come forward with

> "evidence of incidental adverse social effect that provides the important governmental interest justifying reasonable time, place and manner restrictions on speech or expressive conduct." ... Moreover, the legislative body "must ... be prepared ... to articulate and support its argument with a reasoned and substantial basis demonstrating the link between the regulation and the asserted governmental interest."

*Phillips*, 107 F.3d at 173 (internal citation omitted). Accordingly, the court must assess whether Defendant has shown that Ordinance No. 14–19 fulfills each of these requirements.

### a) Substantial governmental interest

■ In order to establish that the ordinance in question is aimed at a substantial governmental interest, the County must demonstrate that it is aimed at the negative secondary effects of adult entertainment businesses rather than the content of the speech. "[E]ven if a time, place, and manner ordinance regulates only businesses selling sexually explicit materials, the ordinance is content-neutral if its purpose is to lessen undesirable secondary effects attributable to those businesses, such as increased crime, lower property values, or deteriorating residential neighborhoods." *ILQ*, 25 F.3d at 1416.

In *Renton*, the Court held that a municipality may rely on the secondary effects studies of other cities as evidence of secondary effects when drafting its ordinances. "The [Supreme] Court has not required that a municipality conduct new studies or produce evidence independent of that generated by other cities or towns, so long as whatever evidence the municipality relied upon is reasonably believed to be

relevant to the problem sought to be addressed." *Renton,* 475 U.S. at 49–50, 106 S.Ct. 925. Similarly, in *Erie,* the Supreme Court upheld an ordinance banning nudity in public places where the city relied on the secondary effects studies of other cities. Citing the "reasonably believed" test from *Renton,* the Court held that:

> [b]ecause the nude dancing at Kandyland is of the same character as the adult entertainment at issue in Renton, Young... and *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects. And Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and [*Young* ] to the effect that secondary effects are caused by the presence of even one adult entertainment establishment in a given neighborhood.

*Erie,* 529 U.S. at 296–297, 120 S.Ct. 1382.

In adopting the new zoning provisions, the Montgomery County Council clearly referred to the secondary effects studies of a number of other municipalities and claimed that, "[i]t is the Council's objective to minimize and control these secondary effects and thereby protect the health, safety and welfare of the citizens." Paper no. 31, Ex. 1, at 3. Not only does the preamble to the Ordinance contain references to the studies and explicitly state that the purpose of the zoning ordinance is to combat the secondary effects cited in the studies, but the County attaches the studies in question to its motion for summary judgment so that the court is clearly apprised of the problems the County thought it was facing. *See Phillips,* 107

F.3d at 174. Under *Renton,* Defendant was allowed to rely on these secondary effects studies of other cities so long as whatever evidence it relied upon was reasonably believed to be relevant to the problem sought to be addressed by Ordinance No. 14–19. *See Renton,* 475 U.S. at 49–50, 106 S.Ct. 925. The studies provided by Defendant with its summary judgment motion address the same issues sought to be addressed by the Montgomery County Council, namely crime and other problems created by adult businesses located near each other or near schools (or other locations frequented mainly by children), residential neighborhoods and houses of worship. *See* Paper no. 31, Ex. 3–7.

Plaintiff's only challenge to the reasonableness of Defendant's reliance upon the secondary effects studies of other cities is its claim that under Justice Kennedy's concurrence in the recent Supreme Court case of *Los Angeles v. Alameda Books,* 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), a plaintiff must be allowed to go to trial to challenge the assumptions made in secondary effects studies relied on by a municipality in enacting a zoning ordinance. Plaintiff misreads *Alameda Books* and Justice Kennedy's concurrence. Justice Kennedy's concurrence, like the plurality, acknowledged that local governments may infer from studies that adult entertainment businesses will create secondary effects.[5] *See id.* at 451–52, 122 S.Ct. 1728 ("[C]ourts should not be in the business of second-guessing fact-bound assessments of city planners ... [the city] is entitled to rely on that knowledge; and if its inferences appear reasonable, we should not say there is no basis for its conclusion"). *Alameda Books* does not af-

---

**5.** *Alameda Books* does not address the specific issue of reliance on secondary effects studies conducted by other municipalities because Los Angeles, unlike the city of *Renton,* had conducted its own study, which the plurality concluded provided sufficient support for the theory underlying the statute at issue. *See id.* at 442, 122 S.Ct. 1728.

fect the County's ability to rely on secondary effects studies and certainly does not mandate a trial in every case where a municipality does so.

Defendant has provided uncontroverted evidence that it relied upon secondary effects studies which it reasonably believed to be relevant to the problems sought to be addressed by Ordinance No. 14–19. Because there is no genuine issue of material fact that Defendant's aim was to try to prevent the secondary effects of adult entertainment businesses, Defendant has successfully demonstrated a substantial governmental interest for Ordinance No. 14–19.

#### b) Narrow tailoring

■ When analyzing the constitutionality of the ordinance under the first element of the *Renton* test, whether it serves a substantial government interest, the question was whether the County reasonably believed it was relying on the studies it cited in passing the ordinance. Here, however, the question is not whether the County properly relied on the studies *per se*, but rather whether those particular studies cited by the County can support a TPM restriction on Bigg Wolf's type of business. Though it does not say so in as many words, Bigg Wolf's challenge to the relevance of the secondary effects studies cited by the County, Paper no. 5, at 16–18, is actually a challenge to the narrow tailoring of the ordinance to the problems explicated in those studies.[6] In other words, Bigg Wolf contends that the studies cited by the County do not justify a 10% floor space limit for adult materials where there is no on-site video viewing.[7]

"A content-neutral time, place, and manner restriction is narrowly tailored if it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *D.H.L. Associates*, 199 F.3d at 59 (quoting *Ward*, 491 U.S. at 799, 109 S.Ct. 2746). The ordinance in *Renton* was found to be narrowly tailored because it, "affects only that category of theaters shown to produce the unwanted secondary effects." *Renton*, 475 U.S. at 52, 106 S.Ct. 925. This is not a strict test. The County need not prove that Bigg Wolf, or a store with just over 10% of its floor space devoted to adult material, would have the exact same adverse effects on the surrounding community as those in the studies it cites as long as the ordinance, "affects only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects ...." *ILQ*, 25 F.3d at 1418. In other words, the ordinance need not adopt the least restrictive alternative by focusing on the precise adverse effects cited in the studies in order to pass constitutional muster. The County, "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres*, 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion).

Furthermore, the Court's recent decision in *Erie*, 529 U.S. at 296–297, 120 S.Ct. 1382, where it held that Erie could justify a ban on activity that was of the same character as adult entertainment in *Renton* and *Young*, indicates that the studies do not have to be directly on point in order to pass the narrow tailoring test. The test is whether stores like Bigg Wolf's or others covered by the ordinance are part of a

---

**6.** Plaintiff made this argument in its motion for a preliminary injunction, which was incorporated by reference into its opposition to Defendant's motion for summary judgment.

**7.** By Plaintiff's own admission, adult materials occupy 61% of the floor space in its store. *See* Wohlfarth Aff. ¶ 5 (attached to Paper no. 33).

category reasonably believed to cause some of the secondary effects referred to in the studies. *See ILQ,* 25 F.3d at 1418.[8]

The County asserts that studies cited by the Ordinance can support a TPM restriction on Bigg Wolf's type of business. It notes that the secondary effects study by the City of Garden Grove, for example, dealt with "adult bookstores," which are defined to include an "establishment with a segment or section devoted to the sale, display, or viewing" of "materials depicting sexually explicit activities." *See* Paper no. 31, Ex. 3 at 010. Based on its own description, Bigg Wolf would fit within this definition. The County also notes that the study by the City of Whittier addressed a variety of adult businesses, from book stores to theaters, and that the Los Angeles, Phoenix and Amarillo studies also addressed all adult businesses. *See id.,* Ex. 4–7. Bigg Wolf has offered no evidence calling into question the applicability of these studies to its type of store. Accordingly, the Ordinance meets the relatively easy burden of narrow tailoring.

### c) Reasonable alternative channels of communication

The parties raise two separate disputes relating to whether the zoning ordinance provides reasonable alternative channels of communication, one legal and one factual. On one hand, Bigg Wolf and the County disagree about the standard for determining whether a site is "available" for relocation and so could be considered an alternative channel of communication. This legal dispute actually encompasses four related determinations: 1) whether to consider the sites available to Bigg Wolf individually or to the group of adult entertainment businesses affected by the ordinance as a whole, 2) whether to consider the reasonableness of alternative avenues of communication at the time the ordinance was passed, at the time suit was filed, at present, or at a time looking forward and projecting the potential number of businesses that might need to locate in the designated zones, 3) whether the site needs to be economically feasible for an adult entertainment business or merely physically available, and 4) whether the sites need to be actually available for sale or rent or merely potentially available. On the other hand, the parties also have a factual dispute over the number of sites that are available within the I–1, I–2 and C–2 zones.[9] The legal dispute, however, will actually be determinative of whether a reasonable number of sites exist because the expert relied upon by Bigg Wolf agrees that, alleged constitutional infirmities aside, seven sites do exist in the relocation zones.

#### i) How to determine which sites are available

Neither the Supreme Court nor the Fourth Circuit has completely refined the test from *Renton* for determining whether particular sites are constitutionally avail-

---

**8.** Although factually dissimilar to the current case, it is worth noting that in *Alameda Books,* the Supreme Court last year held that a study concerning the secondary effects of a concentration of single-use adult entertainment businesses in an area could be used to support the inference that a combination of adult entertainment businesses in one building presents the same risk of secondary effects. *See Alameda Books,* 535 U.S. at 436–439, 122 S.Ct. 1728.

**9.** The County contends that 33 such lots exist. *See* Jetter Aff., Paper no. 31, Ex. 18, ¶ 6. Bigg Wolf, however, points to affidavits filed by an expert who, using data provided by the County in the *Mid–Atlantic* case, pared the number of available sites down to only seven. Paper no. 5, Ex. 3, 4.

able for adult entertainment business relocation. A case from the Eleventh Circuit, *David Vincent, Inc. v. Broward County, Florida,* 200 F.3d 1325 (11th Cir.2000), synthesizes the rulings from other circuits and provides a guideline for answering these questions regarding how to determine the type of sites that should be considered available:

First, the economic feasibility of relocating to a site is not a First Amendment concern. Second, the fact that some development is required before a site can accommodate an adult business does not mean that the land is, per se, unavailable for First Amendment purposes.... Examples of impediments to the relocation of an adult business that may not be of constitutional magnitude include having to build a new facility instead of moving into an existing building; having to clean up waste or landscape a site; bearing the cost of generally applicable lighting, parking or green space requirements; making due with less space than one desired; or having to purchase a larger lot than one needs. Third, the First Amendment is not concerned with restraints that are not imposed by the government itself or the physical characteristics of the sites designated by adult use by the zoning ordinance. It is of no import under *Renton* that the real estate market may be tight and sites currently unavailable for sale or lease, or that property owners may be reluctant to sell to an adult venue.

*David Vincent,* 200 F.3d at 1334–1335.

Bigg Wolf contended in its brief in support of its preliminary injunction motion that the lack of economic feasibility of the sites set forth by the County render them unavailable. However, according to *Renton,* the only requirement is that adult entertainment businesses that need to relocate should be, "on an equal footing with

other prospective purchasers and lessees." *Renton,* 475 U.S. at 54, 106 S.Ct. 925. *Renton* does make clear that commercial viability is not the appropriate consideration. *Id. See also David Vincent,* 200 F.3d at 1334. This is further supported in *D.G. Restaurant,* 953 F.2d at 147, where the Fourth Circuit held that the commercial desirability of sites in an industrial zone is irrelevant. Instead, the standard is that, "... an obstacle that can be overcome without incurring unreasonable expense does not make a site unavailable, but an obstacle that cannot reasonably be overcome renders the site unavailable." *Woodall v. City of El Paso,* 49 F.3d 1120, 1124 (5th Cir.1995). That court described unavailable areas as those lacking infrastructure, unsuitable for generic commercial development or "land under the ocean, airstrips of airports, sports stadiums ...." *Id.* It is clear that economic feasibility is not the appropriate determination of whether a site is available.

Bigg Wolf asserts that, currently, none of the landlords and owners in the available zones will rent or sell to it and argues that this makes those sites unavailable. Bigg Wolf also asserts that many of the sites identified by the County have insufficient numbers of parking spaces, insufficient handicapped access, and insufficient safety due to competition with such entities as heavy trucks. The test from *David Vincent* makes it clear that local governments are under no obligation either to dictate that third parties make their land available to adult entertainment establishments or even to consider whether restrictive covenants or leases exist among third parties rendering a site unavailable. *See Centerfold Club, Inc. v. City of St. Petersburg,* 969 F.Supp. 1288, 1302 (M.D.Fla. 1997). In *Woodall,* owners' unwillingness to rent or sell to an adult business and the fact that the land is currently unavailable for sale or lease were not considered rele-

vant for constitutional availability under *Renton. Woodall*, 49 F.3d at 1125–26. Therefore, for the purposes of *Renton,* these considerations are irrelevant and the fact that none of the landlords will rent to Bigg Wolf does not make those sites unavailable. Plaintiff's claims regarding insufficient parking spaces and other structural deficiencies at some of the proposed sites are also clearly irrelevant. *See David Vincent*, 200 F.3d at 1334–1335. Accordingly, the third and forth questions set forth above relating to constitutional "availability" have been resolved in favor of the County's contentions.

The first two legal questions set forth above are related: whether to consider the businesses as a group or individually and at what point in time to judge reasonable alternative sites. Although many courts have not explicitly said so, most have logically analyzed the number of available sites in relation to the number of adult businesses that would need to relocate at the time the ordinance was passed. The situation will always be fluid, with businesses moving in and out, and the courts should not be involved repeatedly with litigation determining the validity of a zoning ordinance. More importantly, if the reasonableness of alternative sites must be reassessed for each business at the time it decides to relocate, an incentive would be created for businesses to holdout and then to claim that there are no available sites after the other businesses have relocated or litigated. Such a situation not only puts enormous bargaining leverage in the hands of the last holdout, it is a nonsensical way to deal with zoning problems.

To the extent that it considers this question, the case law from other circuits supports this time-frame. "The test is whether the restrictions allow for reasonable alternative avenues of communication *currently,* not whether they *always will allow* for reasonable alternative avenues of communication." *The Ranch House, Inc. v. Amerson*, 146 F.Supp.2d 1180, 1212–1213 (N.D.Ala.2001). Even the Ninth Circuit, which has a more stringent requirement for adequate alternative channels than this circuit, looks at the number of adult entertainment business that must be relocated at the time that the new zoning regime takes effect. *See Topanga Press*, 989 F.2d at 1532–33. Most courts considering this question implicitly adopt this time frame and there are no cases that challenge it or demand that the test for available sites include safeguards for future change. *Ranch House*, 146 F.Supp.2d at 1213. Therefore, the court will consider the number of adequate sites relative to the number of adult entertainment businesses in place at the time the ordinance was passed.

ii) Factual dispute immaterial

■ Even the expert relied upon by Bigg Wolf, Bruce McLaughlin, agrees that there are at least seven sites available for the six adult entertainment businesses which needed relocating at the time the ordinance was passed.[10] Paper no. 5, Ex. 3, 4. McLaughlin then pared down the number of sites to zero for reasons such as deed restrictions, permanent occupants unlikely to relocate, and lack of sufficient

**10.** The County challenges Bigg Wolf's ability to rely on McLaughlin's affidavits, which were not filed in this case, but rather in the *Mid–Atlantic* case. The County claims that Plaintiff failed to comply with the provisions of FED. R. CIV. P. 26(a)(2) by failing to timely identify McLaughlin as an expert and provide

a report from him or a list of other cases in which he has testified. The court need not resolve this dispute because even if Plaintiff's reliance upon McLaughlin's affidavits is proper, they still do not create a genuine issue of material fact.

infrastructure. *See id.* The criteria cited by McLaughlin, however, are speculative and not legally relevant.[11] *See, e.g., D.G. Restaurant Corp.,* 953 F.2d at 147 ("The decision to restrict adult businesses to a specific area does not oblige the city to provide commercially desirable land"). Having resolved above that sites need not be economically feasible or presently available to be constitutionally "available", the court is satisfied that the evidence is uncontroverted that at least seven of the sites identified pass constitutional muster.

The *Renton* test does not prescribe a set number or ratio of sites required, but merely states that it must be "reasonable." Courts considering this question have come up with a variety of formulae, but even the Ninth Circuit, generally more hostile to these types of zoning ordinances, has held that the number of sites available must merely be greater than or equal to the number of adult entertainment businesses in existence at the time the new zoning regime takes effect. *See Topanga Press,* 989 F.2d at 1532–33. Therefore, once concerns about their constitutional availability are removed, even the number of sites available by Bigg Wolf's admission is greater than the number of businesses that need to move. Accordingly, as this appears to satisfy even the most generous formulation of the test for reasonable alternative avenues of communication, the County has satisfied the third prong of the time, place, and manner test for constitutionality of the Ordinance. Therefore, Defendant is entitled to summary judgment on this claim.

### 3. Vagueness and Overbreadth

■ Plaintiff asserts that Ordinance No. 14–19 is void for vagueness and is overbroad on its face and as applied to Plaintiff.[12] In the brief submitted in support of its preliminary injunction, Plaintiff specifically cited the definitions of "adult entertainment business" and "adult entertainment material" in § 59–A–2.1 as overly expansive and vague. Plaintiff contends that these definitions would encompass many "mainstream" businesses like Blockbuster and Hollywood Video, popular motion pictures, and erotic fictional literary works. Plaintiff also argues that the statute is unconstitutionally vague in part because it cross-references provisions of the Maryland criminal code to derive the definitions of "sadomasochistic abuse", "sexual conduct" and "sexual excitement", which may be edited or deleted at some future time.

As a threshold matter, as in *Hart Book Stores v. Edmisten,* 612 F.2d 821 (4th Cir. 1979), Plaintiff lacks standing to raise claims of vagueness and overbreadth. *See id.* at 833 (citing *Young,* 427 U.S. at 61, 96 S.Ct. 2440). Like the plaintiffs in *Hart Book Stores,* Plaintiff here clearly falls within the statute's terms, which designate as an "adult entertainment business" those with adult materials occupying more than 10% of total floor area. Plaintiff freely admits that approximately 61% of its floor area is taken up by the adult section. There is no dispute that most of the materials in this section, as evidenced by photographs provided by Defendant and by

---

11. For example, the infrastructure requirement in the Ninth Circuit's *Topanga Press,* 989 F.2d at 1532, has not been adopted by the Fourth Circuit. In any event, Defendant has provided photographs of the available areas, showing fully developed infrastructure supporting the sites. *See* Paper no. 31, Ex. 22–25.

12. Although Plaintiff made these claims in its complaint and brief in support of its preliminary injunction motion, it did not press these issues at the hearing and does not address them at all in its opposition to Defendant's summary judgment motion.

Plaintiff's own descriptions, fall within the definition of "adult entertainment material" contained in the Ordinance.

The court in *Hart Book Stores* stated as follows:

"In [*Young v. American*] *Mini–Theatres*, [427 U.S. at 61, 96 S.Ct. 2440,] a majority of the Supreme Court (Justice Powell joined in this portion of the opinion) held that, because the ordinance there clearly applied to them, the respondent adult theaters did not have standing to challenge the ordinance for vagueness. The majority agreed that the usual concerns that permit litigants who are not affected by vagueness in a law touching on expression to raise the claim on behalf of others possibly affected are not present when sexually-explicit materials are at issue . . . ."

*Id.* The court noted that for these same reasons, the Supreme Court in *Young* declined to apply the doctrine of overbreadth. *Id.* Because Plaintiff's store clearly falls within the terms of the Ordinance, it lacks standing to challenge them for vagueness, or for overbreadth.

Even if Plaintiff did have standing to mount a challenge on the basis of vagueness and/or overbreadth, the Ordinance would withstand the challenge. The language used in the Ordinance, cited above in the Background section, is not significantly different from language that has survived vagueness challenges in cases such as *Young* and *Hart Book Stores*. As the court in *Hart Book Stores* stated in rejecting the plaintiffs' vagueness argument, "unavoidable imprecision is not fatal and celestial precision is not necessary." *Id.* (citing *Miller v. California*, 413 U.S.

15, 27–28 n. 10, 93 S.Ct. 2607, 37 L.Ed.2d 419; *Roth v. United States*, 354 U.S. 476, 491–92, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). Ordinance No. 14–19 is just as precise, if not more so, as provisions that have been upheld by the Fourth Circuit and the Supreme Court.[13] Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's challenge on the grounds of vagueness and overbreadth.

**4. Prior Restraint**

■ Plaintiff also alleges that the Ordinance creates an unconstitutional prior restraint on protected First Amendment speech. Plaintiff particularly faults the fact that the Montgomery County Department of Permitting Services is allegedly vested with discretion to determine whether to classify a permit applicant as an adult entertainment business or not, including making a determination of whether more than 10% of the floor area is used for adult entertainment materials. Plaintiff also asserts that § 59–A–6.16(a) fails to provide adequate procedural safeguards by failing to ensure prompt resolution of applications for "adult use permits" and failing to provide for a prompt appeal of a denial or revocation of an adult use permit.

Plaintiff appears to both misunderstand County law and misconstrue the prior restraint doctrine. The prior restraint doctrine applies to a permit requirement, but it does not apply to a zoning ordinance that permits adult businesses by right in certain zones. *See 11126 Baltimore Boulevard v. Prince George's County*, 58 F.3d 988, 995 (4th Cir.1995), *cert denied*, 516 U.S. 1010, 116 S.Ct. 567, 133 L.Ed.2d 492

---

**13.** Moreover, Plaintiff has provided no evidence that literary classics or non-adult movies are included within the definition of adult entertainment material or that mainstream video stores will be swept into the definition of adult entertainment business. In fact, the affidavit of Reginald Jetter demonstrated that the County has not included mainstream video stores in that category. *See* Paper no. 31, Ex. 18, ¶ 8.

(1995) (holding that an ordinance that prohibited adult bookstores from operating anywhere within the county until the county granted it a special exception constituted a prior restraint, as opposed to a *Renton*-type time, place and manner restriction). Montgomery County does not require adult businesses to go through the process of applying for an "adult use" permit. *See* Paper no. 31, Ex. 18, ¶ 13.[14] Thus, the prior restraint doctrine is not applicable to Ordinance No. 14–19. Zoning restrictions, such as the one at issue here, are subject instead to a time, place, and manner restriction analysis, which the court has conducted above.

### 5. Equal Protection

■ In addition to the alleged free speech violations, Plaintiff's complaint suggests that the Ordinance's amortization provisions breach the Equal Protection Clause by treating adult businesses differently than other businesses.[15] This claim is without merit. First, Defendant has provided evidence that the County Zoning Ordinance also amortizes "off-site signs" and junkyards in addition to adult businesses. *See* Paper no. 31, Ex. 26. In any event, Plaintiff does not claim to be a member of any suspect class and, consequently, Plaintiff's claim of disparate treatment is subject, at most, to rational basis review. In *Hart Book Stores,* 612 F.2d at 831, the Fourth Circuit recognized a statute aimed at preventing the secondary effects of two adult establishments in the same building as being rationally related to an important state interest. In reject-

ing the plaintiffs' argument that the statute unconstitutionally treated adult businesses differently from other businesses, the court refused to "invalidate [the state's] effort to cope with a problem of commercial regulation under its police power simply because it treats those establishments that are perceived to have undesirable external effects differently from those that do not." *Id.* at 832–33. Under the holding in *Hart Book Stores,* therefore, the Ordinance at issue in the current case easily survives rational basis review.

### D. Defendant's Counterclaim for Injunctive Relief

■ Defendant argues that it is undisputed that Plaintiff is operating its store in violation of the Ordinance, which the court has recognized as passing constitutional muster, and that Defendant is therefore entitled to injunctive relief. Plaintiff contends that this court lacks jurisdiction over Defendant's counterclaim for injunctive relief because the County's zoning provisions provide for an enforcement procedure starting at the administrative level. Plaintiff does not identify the procedure or explain why such a procedure would preclude the County from seeking injunctive relief.

Contrary to Plaintiff's contention, the court may exercise supplemental jurisdiction over Defendant's counterclaim for injunctive relief, pursuant to 28 U.S.C. § 1367(a). However, under 28 U.S.C. § 1367(c)(3), the court has discretion to decline exercising supplemental jurisdic-

---

**14.** Adult businesses, just like any commercial business, are simply required to obtain a valid Use and Occupancy Certificate as required by Chapter 8 Buildings and Chapter 59 Zoning of the Montgomery County Code. *Id.*

**15.** Plaintiff's complaint also cites Article 24 of the Maryland Declaration of Rights. Because Maryland courts have generally interpreted

this provision as in *pari materia* with the Equal Protection Clause of the U.S. Constitution, the court will focus its analysis on federal constitutional law. *See, e.g., Williams v. Prince George's County, Maryland,* 112 Md. App. 526, 685 A.2d 884 (1996). *See also Morrow v. Farrell,* 187 F.Supp.2d 548 (D.Md. 2002).

tion over a claim if the court "has dismissed all claims over which it has original jurisdiction . . . ." [16] In *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surerfooted reading of applicable law." The *Gibbs* Court went on to say that "if the federal law claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.* It seems especially appropriate to decline supplemental jurisdiction on an issue such as enforcement of a County zoning ordinance which, once stripped of its federal constitutional issues, is a land-use function performed by local governments. *See, e.g., Trinity Baptist Church, Inc. v. City of Asheville,* 88 F.Supp.2d 487 (W.D.N.C. 1999). Accordingly, the court declines, pursuant to 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over Defendant's counterclaim for injunctive relief. The court will dismiss the counterclaim for injunctive relief without prejudice.

## III. Conclusion

For the foregoing reasons, Plaintiff's motions to consolidate and strike will be denied. Defendant's motion for summary judgment on the declaratory judgment will be granted, but its counterclaim for injunctive relief will be dismissed. A separate order will follow.

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 28th day of March, 2003, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion of Plaintiff Bigg Wolf Discount Video Movie Sales, Inc. to consolidate its case with *Mid–Atlantic Management Corporation v. Montgomery County, Maryland,* DKC–01–CV–2822, BE, and the same hereby IS, DENIED without prejudice;

2. The motion of Plaintiff Bigg Wolf Discount Video Movie Sales, Inc. to strike certain exhibits to Defendant's motion for summary judgment BE, and the same hereby IS, DENIED;

3. The motion of Defendant Montgomery County for summary judgment BE, and the same hereby IS, GRANTED IN PART;

4. It is hereby DECLARED that Montgomery County, Maryland Zoning Ordinance No. 14–19 is constitutional as a valid time, place, or manner restriction, is not unconstitutionally vague or overbroad, does not constitute a prior restraint on protected speech, and does not violate equal protection;

5. The counterclaim of Defendant Montgomery County for injunctive relief BE, and the same hereby IS, DISMISSED without prejudice; and

6. The clerk shall transmit copies of the Memorandum Opinion and this Order to counsel for the parties and CLOSE this case.

---

**16.** This provision applies when a district court has granted summary judgment on the federal claims, in addition to when it has granted a motion to dismiss the federal claims. *See, e.g., Semple v. City of Moundsville,* 195 F.3d 708 (4th Cir.1999); *Neiswonger v. Hennessey,* 89 F.Supp.2d 766 (N.D.W.Va. 2000).