**KENSINGTON VOLUNTEER FIRE DEPARTMENT, INC., et al.,**

v.

**MONTGOMERY COUNTY, et al.**

Civil Case No. JFM–11–273.

United States District Court, D. Maryland.

May 31, 2011.

John A: King, Brett Alan Pisciotta, King and Attridge, Rockville, MD, for Kensington Volunteer Fire Department, Inc., et al.

Steven C. Kurtz, Bethesda, MD, pro se.

Deborah Rokes, Damascus, MD, pro se.

Stephanie Ayton, Gaithersburg, MD, pro se.

Christine M. Collins, Patricia P. Via, Paul F Leonard, Jr., Office of the County Attorney for Montgomery County MD, Rockville, MD, for Montgomery County, et al.

## MEMORANDUM

**J. FREDERICK MOTZ, District Judge.**

Plaintiffs in this case, a collection of local volunteer fire and rescue departments [1] and several of their former administrative employees [2] (collectively, "Plaintiffs"), have filed this action against defendants Montgomery County and certain county officials [3] (collectively, "Defendants") under various federal and state statutory and constitutional provisions. Plaintiffs seek injunctive relief, declaratory judgment, and damages for Defendants' elimination of public funding for certain administrative support positions at the local volunteer fire departments, allegedly in retaliation for Plaintiffs' opposition to a piece of legisla-

---

1. The LFRD plaintiffs in this case are as follows: Kensington Volunteer Fire Department ("KVFD"), Cabin John Park Volunteer Fire Department ("CJPVFD"), Hyattstown Volunteer Fire Department, Inc. ("HVFD"), the Bethesda Fire Department, Inc. ("BFD").

2. The individual plaintiffs identified in the First Amended Complaint are as follows: Paula Mackel, Janeth Mora, Augustine M. Kelly, and Shawn St. Claire. Additionally, pursuant to Rule 24(b)(1)(B), I granted motions to intervene as plaintiffs filed by three other former LFRD administrative employees, Steven Kurtz, Deborah Rokes, and Stephanie Ayton, because their claims share common questions of law or fact with the main action.

3. Isiah Leggett ("Leggett"), County Executive of Montgomery County, and Richard Bowers ("Bowers"), Fire Chief and Director of the Montgomery County Fire and Rescue Services, are named as defendants as to all counts in the First Amended Complaint. Joseph Adler ("Adler"), Director of the County's Office of Human Resources, and Joseph Beach ("Beach"), Director of the County's Office of Management and Budget, are named as defendants as to Counts I and V only.

tion favored by Defendants. Defendants now move to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) or, alternatively, for summary judgment pursuant to Rule 56. For the reasons stated below, Defendants' Motion to Dismiss is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are uncontroverted or set forth in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Montgomery County Fire and Rescue Service ("MCFRS") is operated by both the County and a collection of independent local fire and rescue departments ("LFRDs"), which provide "fire, rescue and emergency medical services in conjunction with County employees in the Fire and Rescue Service." Code of Montgomery County Regulations ("COMCOR") § 21–1(a); § 2–39A(b). Although each LFRD is an independent corporation under Maryland law, the County has traditionally allocated public monies to fund administrative support positions at the LFRDs, including the positions formerly held by the individual Plaintiffs in this case. (First Am. Compl. ¶ 8.) Notwithstanding the public funding for these positions, however, the County Code of Regulations states that these administrative personnel are still considered employees of the individual LFRDs, not the County. *See* COMCOR § 21–16(a) ("Employees of local fire and rescue departments who are paid with tax funds are not County employees."); *see also* COMCOR § 21–16(c)

("Nothing in this Chapter means that employees of the local fire and rescue departments are County employees, either on a *de jure* or *de facto* basis.").

In May 2010, the County Council passed Budget Resolution 16–373 approving the budget for fiscal year 2011. Out of a total operating budget of approximately $1.16 billion, the County Council allocated approximately $1.58 million for the personnel costs of the LFRDs. (Budget Resolution No. 16–373: FY 2011 Operating Budget, Defs.' Ex. C, at 5–25.) Among other things, these monies were slated to be used to fund a total of twenty administrative support positions at various LFRDs. Additionally, Budget Resolution 16–373 contained a provision stating that all budget appropriations were contingent upon a requirement that the County Executive "transmit to the Council any recommended budget savings plan or similar action" for review and approval by the Council. (Budget Resolution No. 16–373, Defs.' Ex. C, at 5–14.)

As 2010 wore on, the County determined that, consistent with Resolution 16–373, it would need to implement a budget savings plan for FY 2011.[4] Specifically, the County sought to offset the loss of revenue caused by the anticipated defeat of Bill 13–10, a piece of legislation which authorized the imposition of an Emergency Medical Services Transport fee ("EMST fee"). The EMST fee was projected to generate $14.1 million annually in revenue, and the County Council had incorporated this expected revenue into its FY 2011 budget plan. However, Bill 13–10 encountered fierce opposition after its proposal, and a petition campaign succeeded in subjecting

---

**4.** The implementation of a mid-year budget savings plan is not an uncommon occurrence in Montgomery County. Plaintiffs' exhibits reveal that the County Council and the County Executive had "frequently collaborated on mid-year savings plans of this kind" in prior

years. (Pls.' Ex. 11, Mem. to County Council, at 1.) In fiscal years 2008, 2009, and 2010, for example, the County Council approved mid-year savings plans of $33.2 million, $33.0 million, and $99.4 million, respectively. (*Id.*)

it to a referendum vote on the November 2010 ballot, which would later succeed in defeating the bill. The LFRDs and other volunteer groups were particularly active in their opposition to Bill 13–10, and Plaintiffs allege that "[v]olunteer opposition to the [EMST] fee was widely publicized throughout Montgomery County, and beyond." (First Am. Compl. ¶ 22.) Prior to the referendum vote—but after recognizing that the ballot measure to defeat the EMST fee would "most likely succeed"— County Executive Isiah Leggett ("Leggett") sent a budget savings plan proposal to the County Council in an effort "to address the potential loss of revenue" caused by the expected defeat of the bill. (Pls.' Ex. 6, FY11 Savings Plan Proposal, at 1.)

Leggett's savings plan proposal called for $14.3 million in spending cuts and the elimination of 133 publicly funded positions. (Pls.' Ex. 6, FY11 Savings Plan Proposal.) These proposed cutbacks affected a wide range of departments and services, including the MCFRS, the Department of Transportation, the Police Department, the Department of General Services, the Department of Recreation, the Public Libraries, and the Department of Health and Human Services. (*Id.*) Most pertinent to the instant suit, however, was a recommendation to "discontinue funding 20 LFRD civilian employees," at a savings of $592,000, and to offset their workload by creating five new administrative positions with the County. (*Id.*) The proposal did not recommend cutting funding for any non-volunteer administrative support positions within MCFRS, and Plaintiffs assert that LFRD funding cuts were made "solely for the purpose of punishing, and retaliating against, the LFRDs" for their opposition to the EMST fee. (First Am. Compl. ¶ 17.)

Less than two months later, on December 2, 2010, Leggett submitted to the County Council a second savings plan for FY 2011 proposing "additional reductions" in an effort to close the gap on a projected $300 million budget shortfall for FY 2012. (Pls.' Ex. 4, FY11 Revised Savings Plan Proposal, at 1.) In a cover letter accompanying this proposal, Leggett explained that further budget cuts were necessary because "tax revenues in both FY11 and FY12 are anticipated to be below previous estimates" in light of the "continued weakness in the national, regional and local economy." (*Id.*) The revised savings plan called for even deeper reductions and proposed $36 million in budget cuts from a range of agencies. The revised plan contained no additional LFRD budget reductions, but it did retain the earlier proposal to eliminate funding for twenty LFRD administrative positions. (*Id.*)

This revised savings plan was discussed at a session of the County Council on December 14, 2010. Plaintiffs contend that in testimony before the Council, Fire Chief Richard Bowers ("Bowers") spoke in support of the proposal and "promoted the impression that the Council's choices [for funding priorities] lay between 'boots on the ground' and administrative personnel that readily could be supplanted by MCFRS operational personnel." (First Am. Compl. ¶ 20.) Plaintiffs also emphasize that during the session of the Council, Councilmember Elrich appeared to blame the LFRDs for the defeat of the EMST fee and the subsequent budget crunch, and he stated that he thought LFRD budgets should be cut even further than called for by the savings plan.[5] (*Id.* ¶ 19.) Meanwhile, another councilmember assailed the proposal for having a "disproportionate hit

---

5. Councilmember Elrich's exact statement reads as follows: "I wish there frankly were

more cuts to the volunteer side of the fire service because we wouldn't be niggling over

on the volunteers." (*Id.* ¶ 21.) In the end, however, the County Council passed Budget Resolution 17–17 and thereby authorized reductions of $32,249,170 from the FY 2011 operating budget. (Pls.' Ex. 7, Budget Resolution No. 17–17: FY 2011 Savings Plan.) Of this total figure, approximately $592,000, or about 1.8%, would have been used to fund the twenty LFRD administrative support positions. (*Id.*)

Two days after the passage of the savings plan, Bowers sent a letter to each LFRD stating that as of the end of the year, "LFRD employees will no longer by paid by Montgomery County." (Bowers Letter, Pls.' Ex. 3.) The letter went on to explain that each LFRD "must immediately determine if the LFRD will retain your employee or effect a Reduction in Force (RIF)." (*Id.*) The letter further encouraged the LFRDs to "reference Section 30 Montgomery County Personnel Regulations ["MCPR"] to process a RIF, if your LFRD elects to take this course of action." (*Id.*) Soon thereafter, each of the plaintiff LFRDs notified its administrative employees that it would be conducting a RIF pursuant to section 30 of the MCPR and terminating their administrative positions. (*See, e.g.,* KVFD Termination Letter, Defs.' Ex. L.)

Given the LFRDs' active and well-publicized opposition to Bill 13–10, Plaintiffs assert that Defendants eliminated funding for the LFRD administrative positions "as retaliation for Plaintiffs' exercise of legally protected rights in having opposed ambulance fee legislation." (First Am. Compl. at 4.) Plaintiffs filed this action on January 4, 2011 in state court alleging five counts [6] and seeking injunctive and declaratory relief as well as damages. Specifically, Plaintiffs allege that Defendants actions violate the First Amendment of the United States Constitution, Article 40 of the Maryland Declaration of Rights, 42 U.S.C. § 1983, Maryland's common law ban on abusive discharge, and various County personnel regulations. (First Am. Compl. ¶ 38.) On February 1, 2011, Defendants removed the case to this Court pursuant to 28 U.S.C. § 1331 because of federal questions presented by the pleadings. Defendants filed the instant motion to dismiss and/or for summary judgment on February 4, 2011. On March 23, 2011, upon consent of Defendants, Plaintiffs filed an amended complaint adding several additional plaintiffs and dismissing the County Council as a defendant. The parties stipulated that Defendants' pending Motion to Dismiss and/or for Summary Judgment would be applicable to and binding upon all parties and claims, old and new. (Stipulation Regarding Plaintiffs' Filing of Amended Verified Complaint, Mar. 22, 2011, ECF No. 22 at 2.)

## ANALYSIS

### I. *Standard of Review*

█ As permitted by Federal Rule of Civil Procedure 12(d), Defendants seek

---

these, you know, few little hundred thousand dollars here and hundred thousand dollars there if we had twelve more million dollars in the budget. And we don't have proposals for deeper cuts where I think we ought to make deeper cuts." (First Am. Compl. ¶ 19.)

**6.** Count One seeks an immediate injunction prohibiting the defunding of the LFRD administrative positions. (First Am. Compl. ¶¶ 36–39.) Count Two alleges a violation of 42 U.S.C. § 1983. (*Id.* ¶¶ 40–41.) Count

Three alleges an abusive discharge claim under Maryland common law. (*Id.* ¶¶ 42–43.) Count Four alleges violations of the First Amendment of the United States Constitution and Article 40 of the Maryland Declaration of Rights. (*Id.* ¶¶ 44–45.) Count Five seeks a writ of mandamus compelling Defendants to comply with the reduction in force requirements set forth in the Montgomery County Personnel Regulations ("MCPR"). (*Id.* ¶¶ 46–47.)

dismissal pursuant to Rule 12(b)(6) or, in the alternative, summary judgment pursuant to Rule 56. Because I need not consider matters outside the pleadings in resolving this motion, I will treat Defendants' Motion as a Rule 12(b)(6) motion to dismiss. When considering such a motion, courts must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States,* 120 F.3d 472, 474 (4th Cir. 1997). Courts may also consider any documents attached to the complaint, "as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Philips v. Pitt Cnty. Mem. Hosp.,* 572 F.3d 176, 180 (4th Cir.2009). Courts need not, however, accept unsupported legal allegations or legal conclusions couched as factual allegations. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted). Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." *Id.*

## II. *First Amendment and Article 40 Claims*

Count IV charges that the alleged retaliatory defunding of the LFRD's administrative support positions violates Plaintiffs' rights to free speech and freedom of asso-

ciation under the First Amendment to the United States Constitution and under Article 40 of the Maryland Declaration of Rights.[7] Count II alleges that because Defendants were acting under color of state law, this same alleged deprivation also gives rise to a violation of 42 U.S.C. § 1983. For the reasons that follow, these counts are dismissed. Additionally, Count I is dismissed to the extent that it incorporates First Amendment and Article 40 claims in its application for injunctive and declaratory relief.

### A. *Alleged Illicit Legislative Motive*

■ Plaintiffs do not dispute that the budget savings plan is a facially valid piece of legislation. Instead, Plaintiffs assert that they were unconstitutionally targeted by the savings plan, including the funding cuts to the LFRD personnel budget, solely as retaliation for their opposition to the proposed EMST fee. Necessarily, such an allegation requires an examination of Defendants' motives in enacting the savings plan. Defendants, however, maintain that in cases such as this one, where a plaintiff challenges a facially valid statute of general applicability, courts cannot look to legislative motive to demonstrate a violation of the First Amendment. Defendants are correct, and for that reason Plaintiffs fail to state a claim under the First Amendment and Article 40.

■ In *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Supreme Court reaffirmed the "familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* at 383, 88 S.Ct. 1673. The plaintiff in that case had argued that a law banning the burning of draft cards was unconstitu-

---

**7.** Article 40 is treated as "co-extensive" with the First Amendment, and it is construed *in* *pari materia* with it. *Newell v. Runnels,* 407 Md. 578, 967 A.2d 729, 743 n. 11 (2009).

tional because Congress' purpose in enacting it—as evidenced by the statements of three individual Congressmen—was to punish draft protesters and thereby suppress freedom of speech. *Id.* at 385, 88 S.Ct. 1673. The Court, however, explained that although legislative motives may properly be considered when the task is to interpret a statute, "[i]t is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *Id.* at 383, 88 S.Ct. 1673. In such a case, "inquiries into congressional motives or purposes are a hazardous matter" because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 383–84, 88 S.Ct. 1673. Thus, notwithstanding the apparent desire of several legislators to punish expressive conduct, the Court held that because the statute was facially constitutional, it would not invalidate it on the basis of the allegedly illicit legislative motive.

The Fourth Circuit has faithfully applied the *O'Brien* rule in its own decisions. For example, in *D.G. Restaurant Corp. v. City of Myrtle Beach,* 953 F.2d 140 (4th Cir. 1991), the court considered a challenge to a zoning ordinance prohibiting businesses from offering topless dancing within 500 feet of certain areas. The court rejected the plaintiff's argument that the true motive of the city legislators was to restrict protected expression: "[T]he individual motives of legislators ... are rarely relevant to a court's consideration of the legitimacy of the legislation. For good reason, courts have not as a general rule found legislation unconstitutional based on the motive of the voting legislators when the legislation is facially constitutional." *Id.* at 146; *see also McDoogal's East, Inc. v. Cnty. Comm'rs of Caroline Cnty.,* 341 Fed. Appx. 918, 924 (4th Cir.2009) ("[A] court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.").

The teaching of *O'Brien* also applies with full force to First Amendment challenges based on alleged political retaliation. *Fraternal Order of Police Hobart Lodge # 121, Inc. v. City of Hobart,* 864 F.2d 551 (7th Cir.1988), a case involving facts strikingly similar to those presented by this suit, serves as a particularly illustrative example. In that case, the city of Hobart's mayor and city council lost a primary election when the city's police force actively supported the opposition candidate. After the primary election-but before leaving office-the lame-duck mayor and council passed a law requiring all city employees to work 40–hour weeks. *Id.* at 553. The law did not have an appreciable effect on most city employees, who already worked a regular five-day week, but it did affect the town's police officers, whose idiosyncratic schedule called for less than 40 hours per week. The Hobart police union and several of its members alleged that the new law was retaliation for their support of the opposition candidate in the primary election, and they brought a § 1983 action against the mayor and others alleging First Amendment violations. *Id.*

■ As an initial matter, the *Hobart* court accepted as true the complaint's allegation that "the only motive for the enactment of the ordinance was to punish the police for having opposed ... the very officials who enacted the ordinance." *Id.* at 554. Furthermore, the court noted that the council members had failed to invoke their legislative immunity in the district court and therefore had waived the right to assert it on appeal. *Id.* Nevertheless, the court affirmed the dismissal of the case based on the familiar principle that "courts

will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *Id.* (quoting *O'Brien*, 391 U.S. at 383, 88 S.Ct. 1673). Judge Posner, writing for the court, explained that although inquiries into legislative motive may be proper in some rare situations, the *O'Brien* rule "survives undiminished in cases such as this where the statute or ordinance does not single out particular individuals or groups for benefits or burdens and is not challenged as discrimination on invidious grounds such as race, religion, and sex." *Id.* Because the challenged enactment "appeared to be an utterly commonplace personnel regulation" that "[n]o outside observer ... would suppose [was] directed against the police or any other definable group," this suit did not fall within the narrow class of cases in which inquiry into legislative motive is permitted. *Id.* The court concluded that because evidence relating to the legislature's motive was inadmissible to prove a First Amendment violation, dismissal was warranted under Rule 12(b)(6).[8]

Plaintiffs raise two principal arguments in an attempt to avoid the reach of *O'Brien* and its progeny. First, Plaintiffs argue that Fourth Circuit law permits judicial scrutiny of legislative motives even when a statute is facially valid. To be sure, *O'Brien's* prohibition on inquiring into legislative motives is subject to a few limited exceptions,[9] but Plaintiffs argue that cases like *Berkley v. Common Council of Charleston*, 63 F.3d 295 (4th Cir.1995), and *Burtnick v. McLean*, 76 F.3d 611 (4th Cir.1996), permit judicial examination of legislative motives in a much broader context. Plaintiffs misread these cases. Berkley and *Burtnick* both stand for the now well-recognized proposition that local government bodies do not possess absolute immunity from suits brought under § 1983, and Defendants in this case do not dispute that a § 1983 claim against the County is theoretically possible. (Defs.' Mem. at 12.) Yet whether a legislature is immune from suit is quite a different question from whether, after the suit is filed, a court may rely on alleged improper legislative motives to strike down an otherwise

---

**8.** The *Hobart* court also identified two secondary grounds for affirming the district court's dismissal, both of which are equally applicable to the case at bar. First, Judge Posner explained that even assuming the challenged enactment did intend to punish the police for their support of opposition candidate, the tendency of politicians to favor their supporters and mulct their opponents simply amounts to "the characteristic operation and outcome of representative government," not a violation of First Amendment rights. *Id.* at 555. In short, the First Amendment "does not purge politics from politics," and courts are "reluctan[t] to suppose ... that the First Amendment is properly understood to have banished political considerations from public employment." *Id.* Second, as a practical matter, accepting the plaintiffs' argument would "put at hazard a vast amount of routine legislation." *Id.* If every ordinary, facially constitutional budget enactment were suddenly subject to invalidation upon evidence that it intended to punish po-

litical opponents, "[t]he expansion of judicial review of legislation would be breathtaking." *Id.*

**9.** The Supreme Court noted that an inquiry into legislative motive may be proper when "the very nature of the constitutional question requires an inquiry into legislative purpose," such as when a law is challenged as a bill of attainder. *O'Brien*, 391 U.S. at 383 n. 30, 88 S.Ct. 1673. The Fourth Circuit has further noted that an inquiry into legislative motive may also be appropriate in race or sex discrimination cases and in free speech cases "when the challenged legislation has on its face some content-based, *direct* inhibiting effect on freedom of speech." *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1259 & n. 8 (4th Cir.1989) (emphasis in original). Yet these exceptions apply only in "rare circumstances," *D.G. Rest.*, 953 F.2d at 147, and certainly are not implicated by the ordinary and general budgetary enactment at issue in this case.

valid statute.[10] Berkley and *Burtnick* never reached this latter issue, and Plaintiffs' reliance upon them is unsound.

Second, Plaintiffs appear to argue that the Court need not inquire into legislative motives in the first place because the statements of certain government officials, standing alone, clearly establish the retaliatory nature of the challenged savings plan. In particular, Plaintiffs make much of the fact that prior to the vote on the savings plan, Councilmember Elrich appeared to blame the LFRDs for the defeat of Bill 13–10 and expressed a desire to further cut their funding as apparent punishment for their opposition to the EMST fee. (First Am. Compl. ¶ 21; Pls.' Opp'n at 9.) The isolated comment of a single legislator, however, is insufficient to adequately state a First Amendment claim based on political retaliation. Indeed, *O'Brien* involved a situation in which the statements of *three* legislators evinced an unconstitutional motive, and even then the Supreme Court upheld the challenged law because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.* at 384, 88 S.Ct. 1673. The Fourth Circuit echoes this rule: "The individual motives of legislators . . . are rarely relevant to a court's consideration of the legitimacy of the legislation. For good reason, courts have not as a general rule found legislation unconstitutional based on the motive of the voting legislators when the legislation is facially constitutional." *D.G. Rest. Corp.,* 953 F.2d at 146. In sum, an alleged illicit legislative motive—even if articulated by one or more legislators—is insufficient to invalidate an otherwise constitutional and generally applicable statute.[11]

■ It is therefore clear that under the *O'Brien* line of cases, so long as Montgomery County's budget savings plan is otherwise constitutional, the existence of any alleged illicit legislative motive for enacting it is not a proper subject of judicial inquiry. The obvious question then becomes whether the challenged savings plan is "otherwise constitutional." Although Plaintiffs assert that the enactment was driven by an illicit retaliatory motive, there is no doubt that Defendants had the authority to pass the budget savings plan, and it appears to be a thoroughly ordinary cost savings measure. Nothing about the enactment is facially unconstitutional, and it makes no distinctions on the basis of

---

**10.** The Seventh Circuit's opinion in *City of Hobart* illustrates this distinction. There, the court made an initial determination that members of the city council had waived the defense of legislative immunity and therefore could be sued under § 1983. 864 F.2d at 554. Nevertheless, the court ultimately affirmed the dismissal of the complaint on the ground that courts cannot rely on legislative motives to overturn legislation that is otherwise constitutional. *Id.*

**11.** Plaintiffs also contend that two excerpts from letters written by County Executive Leggett are similarly probative of the unconstitutionality of the savings plan. In one excerpt, Leggett makes passing reference to "those whose actions have made these service cuts necessary." (Pls.' Opp'n at 5, 10.)

In the other, Leggett states that the "volunteer leadership" had "worked against the public interest—and their own" by opposing the ambulance fee legislation (Pls.' Opp'n at 4.) Plaintiffs' emphasis on these statements is curious. The first statement is entirely ambiguous, as it is not even clear to whom Leggett is referring. The second statement simply demonstrates an obvious difference of opinion about the EMST fee, a measure that Leggett believed would be beneficial to both the general public and the LFRDs. Yet even assuming that these statements demonstrate some sort of animus towards Plaintiffs, they are insufficient to invalidate the challenged savings plan for the same reason that Councilmember Elrich's statement is irrelevant to this question.

race, gender, religion, or any other invidious basis. Moreover, the savings plan certainly is not "directed against the plaintiffs and no one else." *See City of Hobart*, 864 F.2d at 556. To the contrary, the funding cuts called for by the savings plan impact a broad range of departments and programs, including the Department of Transportation, the Police Department, the Public Libraries, and the Montgomery County Public Schools. More specifically, although the savings plan authorizes spending cuts of over $32 million from the FY 2011 operating budget, only $592,000 of this total, or about 1.8%, came from the LFRDs' administrative personnel budget. (Pls.' Ex. 7, Budget Resolution No. 17–17: FY 2011 Savings Plan.) Far from being targeted specifically at Plaintiffs, the savings plan is instead "general in its wording and impact." *City of Hobart*, 864 F.2d at 556. In sum, the challenged savings plan is shown to be an ordinary, facially valid ordinance that neither discriminates on an invidious basis nor singles out specific individuals or groups for burdens. Consequently, under well-settled constitutional principles, any inquiry into the legislative motive behind the statute is prohibited, as courts "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *O'Brien*, 391 U.S. at 383, 88 S.Ct. 1673.

### B. *Legislative Immunity*

■ Although I have already held that Plaintiffs have not stated a claim under the First Amendment and Article 40, I also note that even if Plaintiffs could rely on alleged legislative motives to challenge the savings plan, individual defendants Leggett and Bowers would still possess legislative immunity from suit. "Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities." *Bogan v. Scott–Harris*, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79

(1998). Moreover, "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions." *Id.* at 55, 118 S.Ct. 966; *see also Marylanders for Fair Representation v. Schaefer*, 144 F.R.D. 292, 298 (D.Md. 1992) ("It is the *function* of the government official that determines whether or not he is entitled to legislative immunity, not his title."). Whether a particular act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it," and "legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54, 118 S.Ct. 966 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). Using this functional approach, the Supreme Court has held that a town mayor was entitled to legislative immunity because his "introduction of a budget and signing into law an ordinance were formally legislative, even though he was an executive official." *Id.* at 55, 118 S.Ct. 966.

■ Although neither Leggett nor Bowers are elected legislators, their inclusion as named defendants in this case stems from actions that were legislative in nature. Leggett is named as a defendant because he proposed and submitted to the County Council the challenged budgetary legislation. (First Am. Compl. ¶¶ 11–12.) The Montgomery County Charter states that, as part of the budgetary process, the "County Executive shall submit to the Council ... comprehensive six-year programs for public services and fiscal policy." Montgomery County, Md., Code § 302; *Haub v. Montgomery Cnty.*, 353 Md. 448, 727 A.2d 369, 370 (1999). The County Code of Regulations further specifies that the County Executive must review the Fire Chief's budget recommendations and submit them to the County Council. COMCOR § 21–22(c). This is what Leggett

did, just as he was required to do by County law. Obviously, then, his budget proposal was clearly within "the sphere of legitimate legislative activity." *Bogan,* 523 U.S. at 55, 118 S.Ct. 966. As such, Leggett possesses absolute immunity from suit on the basis of this budget proposal.

■ Bowers is named as a defendant because he gave allegedly misleading testimony during a session of the County Council just prior to the vote that approved the budget savings plan. (First Am. Compl. ¶ 20.) In *Bogan,* the Supreme Court reaffirmed that "legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bogan,* 523 U.S. at 54, 118 S.Ct. 966 (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). In interpreting *Bogan's* directive that "legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity," 523 U.S. at 54, 118 S.Ct. 966, courts have held that "speaking before a legislative body" is "of course" a type of legislative activity to which absolute immunity applies. *See Baraka v. McGreevey,* 481 F.3d 187, 196 (3d Cir.2007); (*cf. United States v. Johnson,* 383 U.S. 169, 184–85, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966)). Accordingly, the doctrine of legislative immunity likewise shields Bowers from suit in this case.

Plaintiffs contend, however, that Leggett and Bowers do not enjoy legislative immunity because their challenged actions were taken in their administrative capacities. Specifically, Plaintiffs assert that Bowers neglected his administrative responsibilities to "treat the LFRDs fairly and equally" and that Leggett authorized the cuts to LFRD funding "in his executive capacity, albeit rubbing up against the cloak of legislative immunity." (Pls.' Opp'n at 25.) Courts have emphatically rejected this so-called "backdoor approach" to interpreting the legislative immunity doctrine:

> [B]udgetmaking is a quintessential legislative function, reflecting the legislators' ordering of policy priorities in the face of limited financial resources. When budgets are cut materially in an industry as labor-intensive as that of local government, some people will almost surely lose their jobs. But that does not convert a budget cut into an "administrative" employment decision.... Almost all budget decisions have an effect on employment by either creating or eliminating positions or by raising or lowering salaries. This reality, however, does not transform a uniquely legislative function into an administrative one.

*Rateree v. Rockett,* 852 F.2d 946, 950 (7th Cir.1988). I agree with the holding in *Rateree* and will not permit Plaintiffs to skirt the boundaries of the legislative immunity doctrine simply by reframing certain traditionally legislative acts as "administrative."[12] Accordingly, I find that absolute legislative immunity attaches to the actions taken by Bowers and Leggett in this case.

---

**12.** Plaintiffs attempt to counter such clear precedent by citing *Carver v. Foerster,* 102 F.3d 96 (3d Cir.1996), a case in which the Third Circuit held that a local government official could not assert a legislative immunity defense. The dispute in *Carver* centered around the official's "unilateral order to have [certain employees] fired," not a legislative enactment. This distinction is important, as *Carver's* holding was limited to cases involving "conduct taken prior to and independent of legislative action." *Id.* at 102. Indeed, the Third Circuit expressly stated that because the case arose from actions completely divorced from the legislative context, its decision would not "open the floodgates for future plaintiffs wishing to attack legislators for their votes on controversial budgeting matters." *Id.* Consequently, *Carver* provides no support for Plaintiffs' position in this case.

## III. *Abusive Discharge*

In Count III, Plaintiffs allege that they suffered a "wrongful and abusive discharge from employment" at the hands of the County, Leggett, and Bowers. (First Am. Compl. ¶ 43.) "Maryland does recognize a cause of action for abusive discharge by an employer of an at will employee when the motivation for the discharge contravenes some clear mandate of public policy." *Adler v. Am. Standard Corp.*, 291 Md. 31, 432 A.2d 464, 473 (1981). "To state a claim for abusive or wrongful discharge, a plaintiff must allege that (1) she was discharged; (2) her discharge violated a clear mandate of public policy; and, (3) there is a nexus between the employee's conduct and the employer's decision to fire the employee." *Miller v. Hamm*, CCB–10–243, 2011 WL 9185, at *11, 2011 U.S. Dist. LEXIS 141, at *40 (D.Md. Jan. 3, 2011). I need not determine whether Plaintiffs have satisfied each of these elements, however, because the individual Plaintiffs were employees of the independent LFRDs, not the County. Therefore, the County cannot be held liable on an abusive discharge claim.

The County Code of Regulations states that "[e]mployees of local fire and rescue departments who are paid with tax funds are not County employees." COMCOR § 21–16(a). Moreover, the individual Plaintiffs were discharged by the independent LFRDs, not the County. (*See* Bowers Letter, Pls.' Ex. 3 [e]xplaining that the County would not be funding administrative positions, but that each LFRD must "determine if the LFRD will retain your employee or effect a Reduction in Force (RIF)"; *see also* KVFD Termination Letter, Defs.' Ex. L ["your employment will be terminated at the close of business on February 11, 2011"].) Plaintiffs nonetheless argue that they were "*de facto* dual employees" of the LFRDs and the County, pointing out that they held positions funded by the County, received pay and benefits comparable to those of County employees, and were entitled to the protections of the Montgomery County Personnel Regulations. (First Am. Compl. ¶ 8.) The County Code of Regulations anticipates and expressly forecloses such an argument:

> Nothing in this Chapter means that employees of the local fire and rescue departments are County employees, either on a *de jure* or *de facto* basis. Nothing in this Chapter abrogates the authority of each local fire and rescue department over such functions are hiring, promotion, discipline, and discharge of employees of that department.

COMCOR § 21–16(c).

This case is also easily distinguishable from *Newell v. Runnels*, 407 Md. 578, 967 A.2d 729 (2009), a case brought under the Fair Labor Standards Act ("FLSA") in which the court granted "dual employee" status to the plaintiffs. That holding was premised on the court giving the term "employer" an "expansive interpretation in order to effectuate the FLSA's broad remedial purposes." *Id.* at 771. Because the instant case does not involve the FLSA, and because Plaintiffs have cited no authority suggesting that a similarly "expansive interpretation" of the term "employer" is warranted for abusive discharge claims, *Newell's* holding has only limited relevance to the facts of this case.[13]    In

---

**13.** Plaintiffs also argue that the tort of abusive discharge was designed to compensate injured plaintiffs when no administrative remedy was available. They report that they recently lost at an administrative hearing when the Merit System Protection Board ruled that they were "foreclosed from any administrative relief against the County," and so they contend that their failure to obtain administrative relief "trigger[s] the application of a

sum, I hold that the County was not the Plaintiffs' employer, dual or otherwise, and so Plaintiffs have not stated a claim upon which relief can be granted.

## IV. *Reduction in Force Regulations*

■ In Count I, Plaintiffs assert a claim against Defendants for failure to comply with the reduction in force ("RIF") procedures set forth in Section 30 of the Montgomery County Personnel Regulations ("MCPR"). In Count V, Plaintiffs seek a writ of mandamus compelling Defendants to comply with the RIF procedures set forth in the MCPR. These claims fail for the same reason as the abusive discharge claim—namely, that Plaintiffs are employees of the independent LFRDs, not the County. Accordingly, it is the LFRDs who therefore must comply with the provisions set forth in Section 30 of the MCPR, as they were the entity enacting the RIF. Indeed, this fact apparently was understood by both parties at the time of the RIF. Soon after the budget cuts were announced, Bowers sent a letter to LFRD leaders encouraging them to "reference Section 30 of the [MCPR] to process a RIF, if your LFRD elects to take this course of action." (Bowers Letter, Pls.' Ex. 3.) Likewise, at least one LFRD acknowledged that it was bound by Section 30's RIF requirements in a termination letter sent to its employee: "the Montgomery County Personnel Regulations, Section 30–9 require KVFD to notify you that your employment will be terminated." (KVFD Termination Letter, Defs.' Ex. L.) For these reasons, Plaintiffs fail to state a claim against Defendants under Section 30's RIF requirements.

---

tort remedy to address the wrongs" they have suffered. (Pls.' Opp'n at 29.) Of course, regardless of Plaintiffs' ability to obtain administrative relief, they cannot prevail on their abusive discharge claim unless they can es-

## CONCLUSION

Because I find that Plaintiffs have failed to state a claim against Defendants, I will grant Defendants' Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). A separate order implementing this judgment is being entered herewith.

## ORDER

For the reasons stated in the Opinion being entered herewith, it is, this 31st day of May, 2011, ORDERED that defendant Montgomery County's Motion to Dismiss the First Amended Complaint (document 17) is granted.

---

tablish that Defendants are liable. As discussed above, however, Defendants were not the employers of Plaintiffs, and so Plaintiffs cannot pursue an abusive discharge claim against them.